# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HENRY LANZ, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 17-757 |
| | ) | Magistrate Judge Maureen P. Kelly |
| v. | ) | |
| | ) | |
| CYNTHIA LINK, THE ATTORNEY | ) | |
| GENERAL OF THE STATE OF | ) | |
| PENNSYLVANIA, and THE DISTRICT | ) | |
| ATTORNEY OF ALLEGHENY COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

## OPINION AND ORDER

Henry Lanz ("Petitioner"), has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"), ECF No. 5, seeking to attack his state court convictions for first degree murder in the killing of his estranged wife, making false police reports, abuse of a corpse and tampering with evidence. For the reasons that follow, the Petition will be denied because none of the nine grounds for relief merits the grant of federal habeas relief. Furthermore, because jurists of reason would not find this disposition of the Petition debatable, a certificate of appealability will also be denied.

## I. FACTUAL BACKGROUND

The Pennsylvania Superior Court in its June 14, 2016 Memorandum, recounted the factual history of the case as follows:

> Lanz and the victim, Paula Lanz, were married and had two children together. At the time of Paula's disappearance on January 28, 2007, the couple had been separated for some time. Paula had an active Protection From Abuse order against Lanz, and was seeking a divorce. Paula was living in the marital residence, while Lanz was living in a second separate residence that the couple had been in the

process of purchasing. The couple had been having a disagreement over the disposition of the second residence in the divorce.

On the afternoon of January 28, 2007, Lanz and his two daughters were at the home of a neighbor, Tina Aubrey. Aubrey overheard Lanz and Paula arguing and heard Paula ask Lanz to bring the children to the local Wal–Mart at 6:00 pm to exchange custody. While Aubrey was speaking with Lanz on the phone later that evening, she overheard the children in the background. When asked why the girls were not with their mother, Lanz responded that Paula had to leave town at the last minute for business and had left the children with him. Paula was never seen alive again after January 28, 2007.

On January 31, 2007, Aubrey called the police and told Sergeant Paul Abel that she had not seen or heard from Paula in several days, and that she thought something might have happened to her. Sergeant Abel called Paula's phone several times, but nobody answered. He then contacted Lanz and informed him that a friend of Paula's had contacted him expressing concern about Paula's disappearance. Lanz again repeated his story that Paula was away on a business trip, and stated that he had spoken with her the night before. Sergeant Abel then contacted Paula's mother, who said she had not heard from Paula in several days, and Paula's supervisor, who said that the victim would have no reason to leave town on a business trip. Paula's supervisor also said that he had tried to contact Paula several times, but his text and voice messages were not returned.

Anthony Perry, a detective with the county homicide unit, interviewed Lanz on February 1, 2007. Lanz told Detective Perry that he had turned the children over to Paula as planned on the evening of January 28th, but that she called him later that night and asked him to watch the kids because she had to leave early the next morning for a business trip. Lanz claimed that he had spoken with Paula on Monday and Tuesday evening, and that both times Paula had told him she had to stay longer on her trip. Lanz claimed that he did not report Paula missing because he thought he had to wait 48 hours before he could file a missing persons report.

Lanz accompanied Detective Perry to the police station to complete the interview, where he consented to a search of his residence, the residence he had shared with his wife, and his vehicle. When Detective Perry discovered that Lanz was subject to an active PFA order that barred him from his wife's residence, he placed Lanz under arrest for violating the order. Detective Perry also issued a nationwide alert to law enforcement authorities to be on the lookout for Paula and her vehicle. A short time later, law enforcement authorities in Nashville, Tennessee, called and reported that they had found Paula's vehicle burning in a parking lot. A body later identified as Paula was found inside the vehicle wrapped in blankets, which were fastened with duct tape. An autopsy determined that the cause of death was two gunshot wounds to the head.

When confronted by the police with news of his wife's death, Lanz volunteered that he did not kill Paula, but instead that his friend, Karl Laughlin, did. Forensic testing at Lanz's residence revealed the presence of blood splatters at the bottom of the basement stairs. DNA analysis confirmed the blood belonged to Paula. There was also an area at the bottom of the stairs where a rug had obviously been recently removed.

According to Lanz, he had been complaining to Laughlin about Paula and the problems they were having. Laughlin allegedly told Lanz not to worry, and that he would "take care of his problem." Lanz claims that while he was outside playing with his children Paula arrived at the house. A short time later Laughlin came outside and told Lanz, "I took care of your problem." Lanz then claims that he took his kids out to eat, and when he returned to the house questioned Laughlin about what he had done. Lanz claims that Laughlin then told him, "I shot her. I'll take care of everything. I'll take care of the cleanup. You work about your alibi." According to Lanz, Laughlin left early the next morning in Paula's van to get rid of the body. Lanz claims that he gave Laughlin $300 and the PIN to Paula's ATM card. Lanz kept in touch with Laughlin over the next several days and sent him money.

Neighbors, who were aware of the problems between Lanz and Paula, said that they frequently watched events at Lanz's residence. According to the neighbors, and contrary to Lanz's story, on the evening of January 28th Lanz was not outside with his daughters during the time he said that he was and that he claimed Laughlin had murdered Paula. The neighbors also told the police that they saw Paula's minivan at the home that evening backed up against the garage door. The neighbors said that they were alerted to the vehicle's presence because they heard tires squealing as Lanz attempted to pull the vehicle out of the icy driveway.

In addition, several witnesses testified that in the months leading up to Paula's death, Lanz made comments about killing his wife. According to a former co-worker of Lanz's, Lanz had once asked him if he knew anyone who could "take care of" his wife, had indicated that he would be pay [sic] someone to do it, and asked if he could get him a small handgun. Another co-worker testified that he once heard Lanz say that he was going to "kill the bitch," referring to Paula, and had later told the co-worker that he was looking to buy a gun.

Laughlin was arrested on an outstanding warrant for assaulting his girlfriend, and was also charged with arson related offenses for setting Paula's van on fire. Laughlin advised the police that he wanted to talk to them about Paula's death. In exchange for an agreement that he would not be charged with criminal homicide, Laughlin told the police his version of the story. According to Laughlin, he had seen Lanz shoot and kill his wife. At trial, Laughlin testified that he was hiding out at Lanz's house because of the outstanding warrant. Laughlin testified that he was with Lanz all day on January 28th, and that he had overheard several phone

conversations Lanz had that day. During one of the calls, Lanz said, "[t]hat bitch is making me move out of this house on the 31st."

Laughlin went on to add that after Paula arrived at Lanz's house, he overheard Paula demand the "land contract" for the second house from Lanz. Lanz allegedly replied that the contract was in the basement, and he and Paula went downstairs to retrieve it. Laughlin then claims he heard Lanz and Paula arguing. According to Laughlin, Lanz called Paula a "fucking bitch." Laughlin stated that he then heard Paula call Lanz an "asshole," followed by a scream and a "popping sound." Laughlin claims that he was alerted by the sound and went downstairs. When he was near the bottom of the stairs, he saw Lanz backing through a door between rooms in the basement, followed by Paula. Paula was holding her jaw and had blood dripping through her hands. Paula then stumbled and fell back into a corner. According to Laughlin, he then saw Lanz walk up to Paula, stand over her, point a gun at her, and fire two rounds into the top of her head, killing her instantly. Lanz then allegedly pointed the gun at Laughlin and said, "I'll kill you. You're going to help me get away with this. I'll kill everybody involved. I'm done. I've reached the end."

According to Laughlin, Lanz then left the room briefly and returned with blankets and duct tape, which he used to wrap Paula's body. Laughlin and Lanz then moved the body into Paula's minivan, and covered it with tires and other debris. Laughlin said he then overheard Lanz make several phone calls, including one to his daughters' babysitter, telling her that Paula was going out of town and that he needed her to come to Paula's house in the morning to watch the girls. Lanz then had Laughlin take one of the girls and drive the van containing Paula's body to Paula's house, while Lanz took his other daughter and drove to Paula's house in his truck. The next morning when the babysitter arrived, Lanz gave Laughlin $300, Paula's ATM card and PIN number, and Paula's cell phone, and asked him to get rid of the body. Lanz told Laughlin that he would call him at several prearranged times.

Laughlin drove south with the body, but stopped at a truck stop to call Lanz and ask for more money. After Lanz wired him the money, Laughlin continued driving, and ended up in Nashville, Tennessee. Laughlin then set Paula's van, still containing her body, on fire, and hitchhiked home to Pennsylvania. Despite reaching an agreement with the police that he would not be charged with criminal homicide, no agreement was made regarding the other charges Laughlin faced for his involvement in the incident. Laughlin was ultimately charged with one count each of arson endangering persons, reckless burning, receiving stolen property, hindering apprehension of prosecution, fraud, abuse of a corpse, tampering with physical evidence, and three counts of criminal conspiracy.

4

Com. v. Lanz, 1134 WDA 2015, 2016 WL 3268833, at *1–3 (Pa. Super. June 14, 2016); ECF

No. 17-12 at 1 – 6 (quoting Com. v. Lanz, No. 871 WDA 2009, at 1 – 8 (Pa. Super. Aug. 24,

2011)).

## II. PROCEDURAL HISTORY

### A. State Court

The Pennsylvania Superior Court, in its June 14, 2016 Memorandum addressing

Petitioner's appeal in the Post Conviction Relief Act ("PCRA") proceedings, recounted the state

court procedural history as follows:

> Lanz was charged with one count each of the following: criminal
> solicitation, criminal homicide; criminal conspiracy, criminal
> homicide; hindering apprehension/concealing evidence; false
> reports to law enforcement; and criminal homicide. On September
> 2, 2008, a jury found Lanz guilty of first-degree murder, criminal
> conspiracy in connection with the charges of abuse of a corpse and
> tampering with evidence, false reports to law enforcement, abuse
> of a corpse, and tampering with evidence.
>
> On December 2, 2008, the trial court sentenced Lanz to life
> without parole for first degree murder, and to concurrent terms of
> one to two years' incarceration each for false reports to law
> enforcement, abuse of a corpse, and tampering with evidence.

> Commonwealth v. Lanz, No. 871 WDA 2009, at 1–8 (Pa. Super. filed 8/24/11)
> (unpublished memorandum). This Court affirmed the judgment of sentence, and
> the Supreme Court of Pennsylvania denied review of the appeal on April 10,
> 2012.

> Shortly thereafter, Lanz filed a timely PCRA petition pro se. The PCRA court
> appointed counsel to represent Lanz. After multiple extensions of time for filing,
> and a breakdown in the operation of the PCRA court, Lanz filed the instant
> second amended PCRA petition raising two claims of trial counsel
> ineffectiveness. The PCRA court subsequently filed a notice of its intent to
> dismiss the petition without a hearing, and on July 21, 2015, the PCRA court
> entered a final order dismissing Lanz's PCRA petition. This timely appeal
> followed.

On appeal, Lanz presents two separate assertions of trial counsel ineffectiveness that he believes entitle him to a hearing before the PCRA court. This Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. *See Commonwealth v. Halley,* 870 A.2d 795, 799 n. 2 (Pa. 2005). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *See Commonwealth v. Carr,* 768 A.2d 1164, 1166 (Pa. Super. 2001). Moreover, a PCRA court may decline to hold a hearing on the petition if the PCRA court determines that the petitioner's claim is patently frivolous and is without a trace of support either in the record or from other evidence. *See Commonwealth v. Jordan,* 772 A.2d 1011, 1014 (Pa. Super. 2001).

Id. at 38 – 39.

The Superior Court affirmed the denial of PCRA relief, addressing the two claims of error on the merits. Petitioner then, through counsel, filed a Petition for Allowance of Appeal in the Pennsylvania Supreme Court, see ECF No. 17-12 at 61 – 64, which was denied on December 16, 2016. Id. at 65.

**B. Federal Court**

After Petitioner paid the filing fee, the instant Petition was filed. ECF No. 5. In the Petition, Petitioner raises nine Grounds for Relief:

> GROUND ONE: Petitioner's Confrontation Rights Pursuant to the Sixth Amendment of the United States Constitution were violated when the State Trial Court Prevented him from Cross-Examining the Commonwealth's key witness.

ECF No. 5 at 6.

> GROUND TWO: Petitioner was Denied his Fundamental Rights to a Fair Trial under both the Fifth and Fourteenth Amendment[s] to the United States Constitution when the State Trial Court Refused to Strike the Testimony of Jessica Nolder, when she failed to identify him.

Id.

> GROUND THREE: Petitioner was Denied his Constitutional Rights to the Effective Assistance of Counsel pursuant to the Sixth Amendment of the United

States Constitution when his Trial Counsel Failed to Fully Argue to the Jury that Karl Laughlin's Testimony concerning the amount of Gunshots was Inconsistent.

Id. at 7.

GROUND FOUR: Petitioner was denied his Constitutional Rights to the Effective Assistance of Counsel Pursuant to the Sixth Amendment to the United States Constitution when Counsel Failed to Present Testimony and/or Evidence that Alexa Lanz witnessed Karl Laughlin Kill the Victim.

Id. at 8.

GROUND FIVE: Initial PCRA Counsel was ineffective for Failing to Raise the Ineffectiveness of Trial Counsel for Failing to Cross-Examine Jessica Nolder, which denied Petitioner his Constitutional Rights to Effective Assistance of Counsel Pursuant to the Sixth Amendment to the United States Constitution.

Id. at 10.

GROUND SIX: Initial PCRA Counsel was Ineffective for Failing to Raise the Ineffectiveness of Trial Counsel for Failing to raised [sic] the Commonwealth's Failure to Disclose Material Evidence Pursuant to Brady v. Maryland Relating to the Crimen Falsi of Karl Laughlin, which in effect, denied Petitioner his Fundamental Constitutional Rights to a Fair Trial under both the Fifth and Fourteenth Amendments to the United States Constitution.

Id.

GROUND SEVEN: Initial PCRA Counsel was ineffective for Failing to Raise the Ineffectiveness of Trial Counsel for Failing to Object to the Trial Court's Erroneous Instruction to the Jury as it related to Third Degree Murder. Such Failure denied Petitioner his Constitutional Rights to a Fair Trial under both the Fifth and Fourteenth Amendments to the United States Constitution.

Id.

GROUND EIGHT: Initial PCRA Counsel was Ineffective for Failing to Raise the Ineffectiveness of Trial Counsel for his Failure to Investigate and Provide Expert Witness Testimony with Concerns to the Blood Evidence Found on the Victim, which in turn, Denied Petitioner his Constitutional Rights under the Sixth Amendment to the United States Constitution.

Id. at 11.

> GROUND NINE: Initial PCRA Counsel was ineffective for failing to raise the ineffectiveness of Petitioner's Trial Counsel for his Failure to Investigate and Provide the Testimony of Detective Russ Thompson of the Metropolitan Police Department – North Precinct CID, Robin Redmond and Doug Soulier, thereby, Denying Petitioner his Constitutional Rights under the Sixth Amendment to the United States Constitution.

Id. at 12.

After being granted an extension of time to respond, ECF No. 15, Respondents filed their Answer, denying that Petitioner was entitled to any federal habeas relief. ECF No. 17. Respondents also attached copies of much of the state court record to the Answer. Id. In addition, Respondents caused the original state court record to be delivered to this Court. Lastly, Respondents filed a Supplement, which was the transcript of the sentencing hearing for Petitioner. ECF No. 18.

All parties have consented to the exercise of plenary jurisdiction by a United States Magistrate Judge. ECF Nos. 12 and 16.

## III. APPLICABLE LEGAL PRINCIPLES

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, tit. I, §101 (1996) (the "AEDPA") which amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254 was enacted on April 24, 1996. Because Petitioner's habeas Petition was filed after its effective date, the AEDPA is applicable to this case. Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000).

Where the state court has reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue is also raised in a federal habeas petition, the AEDPA provides

the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  See 28 U.S.C. § 2254(d) and (e).

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d).  In Williams, the Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States." Id. at 404-05 (emphasis deleted).  A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts could apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court. Second, the state courts can apply the correct rule of law but reach an outcome that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case.

In addition, we look to the United States Supreme Court holdings under the AEDPA analysis as "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." Rodriguez v. Miller, 537 F.3d 102, 106–07 (2d Cir. 2008) (citing Carey v. Musladin, 549 U.S. 70 (2006)).  The United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.'" Dennis v. Sec., Pa. Dept. of Corrections, 834 F.3d 263, 368 (3d Cir.

2016) (en banc) (quoting, <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013) (per curiam)). As the

United States Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for

instances in which a state court unreasonably applies this Court's precedent; it does not require

state courts to extend that precedent or license federal courts to treat the failure to do so as error."

<u>White v. Woodall</u>, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the

claim "resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Finally, it is a habeas petitioner's burden to show that the state court's decision was

contrary to or an unreasonable application of United States Supreme Court precedent and/or an

unreasonable determination of the facts. <u>Moreno v. Ferguson</u>, CIV.A. No. 17-1412, 2019 WL

4192459, at *3 (W.D. Pa. Sept. 4, 2019), <u>appeal</u> <u>filed</u>, 19-3777 (3d Cir. Dec. 6, 2019). This

burden means that Petitioner must point to specific caselaw decided by the United States

Supreme Court and show how the state court decision was contrary to or an unreasonable

application of such United States Supreme Court decisions. <u>Owsley v. Bowersox</u>, 234 F.3d 1055,

1057 (8th Cir. 2000) ("To obtain habeas relief, Mr. Owsley must therefore be able to point to a

Supreme Court precedent that he thinks the Missouri state courts acted contrary to or

unreasonably applied. We find that he has not met this burden in this appeal. Mr. Owsley's

claims must be rejected because he cannot provide us with any Supreme Court opinion justifying

his position."); <u>West v. Foster</u>, 2:07-CV-00021-KJD, 2010 WL 3636164, at *10 (D. Nev. Sept.

9, 2010) ("petitioner's burden under the AEDPA is to demonstrate that the decision of the

Supreme Court of Nevada rejecting her claim 'was contrary to, or involved an unreasonable

application of, clearly established Federal law, *as determined by the Supreme Court of the United*

*States*.' 28 U.S.C. § 2254(d)(1) (emphasis added). Petitioner has not even begun to shoulder this burden with citation to apposite United States Supreme Court authority."), aff'd, 454 F. App'x 630 (9th Cir. 2011).

The United States Court of Appeals for the Third Circuit has recognized the significance of the deference under AEDPA that federal habeas courts owe to state courts' decisions on the merits of federal legal claims raised by state prisoners in federal habeas proceedings and the Third Circuit emphasized how heavy is the burden that petitioners bear in federal habeas proceedings. The Third Circuit explained that: "[w]e also defer to state courts on issues of law: We must uphold their decisions of law unless they are 'contrary to, or involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' So on federal habeas, 'even 'clear error' will not suffice.' Instead, the state court must be wrong 'beyond any possibility for fairminded disagreement.'" Orie v. Sec. Pennsylvania Dept. of Corrections, 940 F. 3d 845, 850 (3d Cir. 2019) (citations and some internal quotations omitted).

## IV. DISCUSSION

### A. Ground One Does Not Merit Relief.

In Ground One of the Petition, Petitioner complains that although his trial counsel was permitted to cross examine Karl Laughlin about the deal he had made with the prosecutors, his trial counsel was not permitted to question Laughlin with regard to the actual sentence that he was facing. More specifically, Petitioner complains that he was not permitted to correct an erroneous statement by Laughlin. Namely, the following exchange occurred between the prosecutor and Laughlin:

Q. So sitting here today, the only deal you have is you're not charged with homicide, right?

A. That's it. I still face just as much time as him.

ECF No. 17-4 at 29 (quoting Trial Transcript) (emphasis deleted). See also ECF No. 5 at 6.

Petitioner complains that this was an erroneous statement because whereas Petitioner faced the possibility of life without parole if convicted of first degree murder, Laughlin did not face the possibility of such a sentence.

The Superior Court addressed this issue as follows:

> A fundamental protection afforded to criminal defendants by the Sixth Amendment of the U.S. Constitution is the right to confront one's accusers. See *Commonwealth v. Quartman,* 458 A.2d 994, 996 (Pa. Super. 1983). "A defendant's right of confrontation includes the right to cross-examine witnesses about possible motives to testify." *Commonwealth v. Dawson,* 486 Pa. 321, 323, 405 A.2d 1230, 1231 (1979).

> Lanz argues that the trial court abused its discretion by refusing to permit him from cross-examining Laughlin about the testimony that he "still face[ed] just as much time as [Lanz]." N.T. Trial, 8/27/08, at 354. First, we point out that the trial court did not prohibit Lanz from cross-examining Laughlin entirely, as Lanz's argument makes it appear, but instead limited the scope of his cross-examination. Lanz argues that he should have been allowed to question Laughlin about the potential sentence he would face if charged with homicide, and that the trial court abused its discretion in prohibiting such a line of questioning. To support his argument, Lanz relies on *Commonwealth v. Wilson,* 619 A.2d 1063 (Pa. Super. 1992).

> In *Wilson,* the trial court prohibited the defense from cross-examining the prosecution's key witness, who also faced charges stemming from the case against Wilson, about unrelated charges pending against him. The trial court also prohibited cross-examination regarding the charges that were dropped and the specific sentence the witness avoided because of his agreement to testify against Wilson. This Court held that the trial court's decisions were an abuse of discretion.

> We find *Wilson* to be distinguishable from the instant case for several reasons.

. . . .

Even if we did believe this decision was improper, however, we would find it to be harmless. ***See Commonwealth v. Hetzel,*** 822 A.2d 747, 759 (Pa. Super. 2003) ("An error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.") (internal citations omitted). Because the jury was plainly aware of Laughlin's deal with the Commonwealth, we do not believe the additional information about his possible sentence would have proved decisively helpful to the defense. Furthermore, there were several other witnesses who testified against Lanz and much more evidence tending to prove his guilt. Therefore, not allowing the jury to hear about the specific sentence Laughlin avoided was harmless.

ECF No. 17-6 at 19 – 22.

Petitioner does not point to any specific holding of the United States Supreme Court that the Superior Court's decision unreasonably applied or was contrary to.[1]

Given that Petitioner fails to point to any specific United States Supreme Court precedent, he fails to carry his burden under the AEDPA. Indeed, this Court is not aware of any precedent from the United States Supreme Court that mandates the potential sentences of state cooperating witnesses be told to the jury as a constituent right under the Confrontation Clause. But see United States v. Chandler, 326 F.3d 210, 223 (3d Cir. 2003), *as amended* (July 18, 2003) ("[W]e find that such an interest is outweighed by [the defendant's] constitutional right to

---

[1]  We note that retired Senior Judge Robert E. Colville filed a dissenting opinion, which disagreed with the majority's distinguishing of the state court decision in Com. v. Wilson and also disagreed with the majority's conclusion that if limiting the cross examination was error, that the error was harmless.   ECF No. 17-6 at 28 – 31.   The disagreement between the majority and dissent did not explicitly rely on any disagreement as to the meaning of any specific United States Supreme Court precedent.

confront [cooperating witnesses]" concerning their actual sentences).[2]  However, we note that Chandler explicitly rejected contrary holdings from two other Circuits.  United States v. Luciano–Mosquera, 63 F.3d 1142, 1153 (1st Cir. 1995) (suggesting that a trial court can secure to a defendant the "minimal constitutional threshold level of inquiry," by permitting her to inquire whether a prosecution witness has received some type of benefit from the government in exchange for her testimony, even while precluding the jury from learning the "actual number of years" a witness believes she would have faced absent her cooperation); United States v. Cropp, 127 F.3d 354, 359 (4th Cir. 1997) ("We embrace the reasoning enunciated in *Luciano-Mosquera*."). Of course, that the Superior Court's decision in this case may be contrary to Third Circuit's decision in U.S. v. Chandler, is not sufficient for Petitioner to carry his burden herein under the AEDPA.  Gipson v. Sheldon, 659 F. App'x 871, 886 (6th Cir. 2016) (refusing to find an on-point decision by the Third Circuit renders the state court decision contrary to United States Supreme Court precedent holding that "*Kamienski* is of course not binding because it is not clearly established Supreme Court precedent."). See also Renico v. Lett, 559 U.S. 766, 779 (2010) ("The Fulton decision [of the United States Court of Appeals for the Sixth Circuit], however, does not constitute 'clearly established Federal law, as determined by the Supreme

---

[2] In Chandler, which, we note, is a direct appeal and not a habeas case, the Third Circuit held that the prosecution's "valid interest in keeping from the jury information from which it might infer [the defendant's] prospective sentence were she to be convicted, that interest did not trump [the defendant's] entitlement under the Confrontation Clause ... to probe the 'possible biases, prejudices, or ulterior motives of the witnesses' against her." Chandler, 326 F.3d at 223. Finally, the court concluded that the error was not harmless beyond a reasonable doubt, because the testimony of the witnesses in question was "essential in showing that [the defendant] was criminally involved" in the conspiracy, id. at 224, and "so much depended on the credibility of the cooperating witnesses" that "additional information about their motives in testifying might have proven decisive." Id. at 225.

Court,' § 2254(d)(1), so any failure to apply that decision cannot independently authorize habeas relief under AEDPA."); Parker v. Matthews, 567 U.S. 37, 48–49 (2012) ("circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA. Nor can the Sixth Circuit's reliance on its own precedents be defended in this case on the ground that they merely reflect what has been 'clearly established' by our cases. The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in Darden bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

Accordingly, Ground One does not afford Petitioner relief in this federal habeas proceeding.

### B. Ground Two Does Not Merit Relief.

During trial, Jessica Nolder testified that the ex-boyfriend of her mother, Robyn Redmond, is Karl Laughlin. Redmond and Laughlin lived together for six to eight months in 2006. T.T. 401 – 02. During that time, Nolder met Petitioner. T.T. 402. Nolder testified that Petitioner approached her and asked her whether she would beat up his wife. T.T. 404.

In Ground Two, Petitioner asserts that the trial court erred in refusing to strike the testimony of Jessica Nolder, who could not identify Petitioner as the man she knew as Henry Lanz.

The Superior Court addressed this issue on the merits as follows:

The witness in question was Jessica Nolder, the daughter of one of Laughlin's ex-girlfriends. According to Nolder's testimony, she had been introduced to Lanz and had talked with him at her house. During one of these conversations, Lanz allegedly offered to pay Nolder approximately $900 to "take care of his wife" and "to go there with a baseball bat ... [and] beat her up severely to where 1 would break her

15

legs." N.T. Trial, 8/27/08, at 404. However, Nolder was unable to identify Lanz in the courtroom.

The Commonwealth relies on *Commonwealth v. Wiley,* 432 A.2d 220 (Pa. Super 1981), to argue that "any indefiniteness and uncertainty in identification testimony goes to its weight[,]" not its admissibility. *Id.* at 225; Appellee's Brief, at. 26. However, the Commonwealth ignores the rest of the relevant language from *Wiley,* and fails to mention that this Court overturned the appellant's conviction because the witness could not identify the appellant beyond a reasonable doubt. 432 A.2d at 228. As recognized by this Court in *Wiley,* our Supreme Court has previously stated that "[i]identification need not be positive and certain in order to convict, but need only constitute proof beyond a reasonable doubt." *Id.* At 225 (citing *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954)).

Here Nolder completely failed to identify Lanz. The trial court, in allowing Nolder's testimony, stated that it was "not the best testimony in the world, but it circumstantially establishes that somebody named Henry Lanz knew Karl Laughlin." N.T. Trial, 8/27/08, at 408. However, there was no question as to whether Lanz and Laughlin knew each other. Lanz admitted as much in his own testimony. Allowing Nolder to testify for the purpose of establishing that Lanz and Laughlin knew each other was unnecessary and needlessly cumulative. **See** Pa. R. E., Rule 403, 42 PA. CONS. STAT. ANN. ("Although relevant, evidence may be excluded if its probative value is outweighed by ... needless presentation of cumulative evidence.").

For the reasons stated above, we believe it was an error for the trial court to admit the testimony of Jessica Nolder. However, the error was harmless. *See Commonwealth v. Hetzel,* 822 A.2d 747, 759 (Pa. Super. 2003). Nolder's testimony was but a very tiny piece of the rather large body of evidence against Henry Lanz. We are confident the jury would have reached the same conclusion had Nolder never testified.

ECF No. 17-6 at 22 – 24.

## 1. Petitioner procedurally defaulted Ground Two.

Respondents contend that the admission of Nolder's testimony and/or the failure to strike her testimony, amounted at most to harmless error, just as the state courts found. ECF No. 17 at 31.

It is now well settled that the proper analysis for a federal habeas court to engage in where the state courts have found an error but found it to be harmless, is for the federal habeas court to conduct its own harmless error analysis. Bond v. Beard, 539 F.3d 256, 275–76 (3d Cir. 2008), as amended (Oct. 17, 2008) ("But our analysis differs somewhat in light of *Fry v. Pliler*, 551 U.S. ----, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007), which the Supreme Court issued after the District Court's opinion. *Fry* instructs us to perform our own harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), rather than review the state court's harmless error analysis under the AEDPA standard. *See Fry*, 127 S.Ct. at 2328.").

However, this foregoing *de novo* Brecht harmless error analysis is not proper here as we now explain. As the Third Circuit in Bond further noted:

> The Supreme Court explained in *Brecht* that an error is harmless if it did not have "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Id.* (quotation marks omitted). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error **of federal law** had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (quotation marks omitted).

Id. (emphasis added).

As made clear by the foregoing quotation, before applying the Brecht harmless error standard in federal Section 2254 habeas cases, there must be a federal legal error made in the course of the state proceedings.

In contrast to the requirement for applying the Brecht harmless error analysis herein, Petitioner fails to show that either the state courts found a federal law violation with respect to

not striking Ms. Nolder's testimony or that such a federal law violation occurred in connection thereto. Indeed, we note that the error(s) with respect to not striking Ms. Nolder's testimony found by both the majority and the dissent of the Superior Court seem to be errors merely of state law rules of evidence and not federal legal errors, i.e., the kind of errors that federal harmless error law as set forth in Brecht is intended to apply to. See, e.g., ECF No. 17-6 at 23 – 24 (majority opinion conducting its analysis in terms of state law rules of admissibility and Pa. Rules of Evidence Rule 403); id. at 32 – 33 (finding that Nolder's testimony was inadmissible hearsay because it did not come within the admissions against interest exception to hearsay). See also Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) ("[I]t is well established that a state court's misapplication of its own law does not generally raise a constitutional claim.") (citations and internal quotation marks omitted).

Nor is it surprising that the state courts found errors only under the state law of Pennsylvania given that Petitioner only cited state law as the basis for the errors alleged with respect to Ms. Nolder's testimony. See Brief for Appellant on direct appeal to the Superior Court, ECF No. 17-4 at 38 (citing Pa. R. Evid. 901(a)); id. at 40 (citing Pa. R. Evid. 401); id. at 41 – 42 (citing Pa. R. Evid. 403); id. at 45 (citing Pa. R. Evid. 802).

However, we note that the error that Petitioner alleges here in federal court under Ground Two is a federal constitutional error of the denial of due process. There are at least two reasons that Ground Two does not provide a basis for federal habeas relief. The first reason is that Petitioner procedurally defaulted Ground Two. The second reason is that Ground Two is meritless.

First we find, notwithstanding that the Commonwealth fails to raise this defense, that Petitioner procedurally defaulted Ground Two because he never raised Ground Two as a federal

constitutional claim in state court but only as a somewhat related state law claim in state court with respect to Ms. Nolder's testimony and the failure to strike it.[3] This, however is insufficient to have fairly presented to the state courts the Fourteenth Amendment claim which Petitioner now herein presents to this federal habeas court and to have avoided a procedural default of Ground Two in state court.

As explained by a former distinguished jurist on this Court:

> In order to properly exhaust, and consequently, in order to avoid procedurally defaulting a federal claim, a state prisoner must have first "fairly presented" in the state courts all of his federal constitutional claims that he raises in his federal habeas petition. For claims to be "fairly presented" in state court, claims raised in state court must be "substantially equivalent to those raised in federal court." *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir. 1996). Furthermore, not only must the legal theory presented to the state courts and the federal habeas courts be the same but the facts presented to the state courts underlying those legal theories must be the same facts presented to the federal habeas court. *See, ie.g.,* [sic] *Gibson v. Scheidemantel,* 805 F.2d 135, 138 (3d Cir. 1986) ("Both the legal

---

[3] This Court has the discretion to raise the issue of procedural default *sua sponte* as explained by the Third Circuit:

> the doctrine of procedural default, while not a jurisdictional rule, "is grounded upon concerns of comity between sovereigns and often upon considerations of judicial efficiency." *Hardiman,* 971 F.2d at 503 (citations omitted). "Because these concerns substantially implicate important interests beyond those of the parties, it is not exclusively within the parties' control to decide whether such a defense should be raised or waived." *Id.* In *Smith,* we explained that our discretion to address a default should be guided by the factors discussed in *Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), with respect to the sua sponte consideration of nonexhaustion. 120 F.3d at 408. Thus, we held that the values of comity, federalism, judicial efficiency, and the "ends of justice" must be weighed in determining whether to consider the default. *Id.* We noted that it might be inappropriate to raise a default where "it is evident that a miscarriage of justice has occurred," *id.*, explaining that a miscarriage of justice in this context " 'should include cases where the record is well developed and the merits strongly support the petitioner's claim.' " *Id.* (quoting *Washington v. James,* 996 F.2d 1442 (2d Cir.1993) (Oakes, J., dissenting)).

Szuchon v. Lehman, 273 F.3d 299, 321 n.13 (3d Cir. 2001).

theory and the facts on which a federal claim rests must have been presented to the state courts."); *Mattis v. Vaughn,* 128 F. Supp.2d 249, 256–57 (E.D. Pa. 2001) ("The petitioner must fairly present to the state courts all the claims made in his habeas corpus petition. To satisfy the 'fair presentation' requirement, the state court pleadings must demonstrate that the legal theory and supporting facts asserted in the federal habeas petition are 'substantially equivalent' to those presented to the state courts") (citations omitted) ....

The court finds that Petitioner completely failed to present his grounds for leave to withdraw his guilty plea as a federal constitutional issue versus a state law issue of being permitted to withdraw his plea prior to sentencing in the sound exercise of the trial court's discretion, in essence, arguing that the trial court abused its discretion for not granting the withdrawal of the guilty plea. *See, e.g., Duncan v. Henry,* 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). *Cf. Wilson v. Briley,* 243 F.3d 325, 328 (7th Cir. 2001) ("[A]buse-of-discretion arguments are ubiquitous, and most often they have little or nothing to do with constitutional safeguards."). The court finds that Petitioner has not satisfied any of the methods set forth above in *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir. 1999) in order to be deemed to have fairly presented this withdrawal of plea issue to the state courts as one raising a federal constitutional claim.

Ely v. Atty. Gen. of Pennsylvania, CIV.A. 08-01, 2009 WL 1248057, at *4–5 (W.D. Pa. May 1, 2009) (footnote omitted).

A review of the record as demonstrated above where we recounted and cited to Petitioner's Superior Court direct appeal brief, conclusively establishes that Petitioner never raised the failure to strike the testimony of Nolder on the grounds that to not do so involved a Fourteenth Amendment substantive due process violation. As such, he has procedurally defaulted Ground Two.

On the record before this Court, Petitioner could not establish cause and prejudice or a miscarriage of justice so as to excuse this procedural default. Accordingly, Ground Two does not merit federal habeas relief.

## 2. Petitioner fails to establish a Fourteenth Amendment Due Process Claim.

The second reason that we find Ground Two fails to merit federal habeas relief is because the claim is meritless.

We note that Respondents, in their Answer, conceded the following with respect to Ground Two: "this claim has been exhausted, is not procedurally defaulted, and is properly before this Court." ECF No. 17 at 29. Even if the Commonwealth waived the defense of procedural default by their concession, Petitioner herein still has the burden of establishing before this Court an error under the Fourteenth Amendment due process clause. ECF No. 5 at 6 ("Petitioner was Denied his Fundamental Rights to a Fair Trial under both the Fifth and Fourteenth Amendment[s]").[4] See Keller v. Larkins, 251 F.3d 408, 414 (3d Cir. 2001) ("Henry's claim was essentially the same as a claim that he had been denied 'the fundamental fairness' guaranteed by the federal due process guarantee.").

As this Court has previously explained:

A claim that one was denied substantive "due process" is a claim that one was denied "fundamental fairness." See Riggins v. Nevada, 504 U.S. 127, 149

---

[4] Petitioner's invocation of the Fifth Amendment's due process clause is simply misplaced as it has no applicability herein under the facts of this case insofar as Petitioner is contending a denial of substantive due process. Thomas v. Palakovich, 3:11-CV-2172, 2012 WL 1079441, at *6 (M.D. Pa. Mar. 30, 2012) ("The Due Process Clause of the Fifth Amendment applies to actions of the federal government, while the Due Process Clause of the Fourteenth Amendment applies to state actors. See U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; see also B & G Const. Co., Inc. v. Dir. Office of Workers' Comp. Programs, 662 F.3d 233, 246 n. 14 (3d Cir. 2011). Because Mr. Thomas does not allege any actions on the part of the federal government, he cannot assert claims under the Fifth Amendment.").

(1992)("We have said that 'the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial,' *Spencer v. Texas*, 385 U.S. 554, 563-564 (1967)[.]"); Lisenba v. California, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is ... to prevent fundamental unfairness"); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a claim that an ... error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial"). Because the guideposts for decision-making under the rubric of due process are lacking, the United States Supreme Court has cautioned that:

> In the field of criminal law, we "have defined the category of infractions that violate 'fundamental fairness' very narrowly" based on the recognition that, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States*, 493 U.S. 342, 352 (1990). The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order.

Medina v. California, 505 U.S. 437, 443 (1992) (some citations omitted).

To establish a substantive due process claim, a petitioner must show both that there was some fundamental error and a reasonable likelihood of prejudice resulting therefrom. See Fadiga v. Atty. Gen. U.S.A., 488 F.3d 142, 158 (3d Cir. 2007) ("A showing of fundamental unfairness in the context faced by the Charleswell court required 'both that some fundamental error occurred and that as a result of that fundamental error [the alien] suffered prejudice.'") (quoting United States v. Charleswell, 456 F.3d 347, 358 (3d Cir. 2006)). Moreover, prejudice in the substantive due process criminal trial context means the "trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." Foy v. Donnelly, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted).

Cunningham v. Wenerowicz, CIV.A. No. 15-1054, 2017 WL 6388276, at *7 (W.D. Pa. Dec. 14, 2017), *certificate of appealability denied*, Cunningham v. Supt. Graterford SCI, No. 17-3813 (3d Cir. Apr. 5, 2018).

We find on the record before us that Petitioner has not carried his burden to establish a Fourteenth Amendment violation, even if we assume without deciding that it was error of some

constitutional magnitude (as doubtful as that appears) to not strike Ms. Nolder's testimony due to her failure to identify Petitioner as Henry Lanz. However, there are two prongs to establishing a substantive due process violation, constitutional error and prejudice resulting therefrom. Petitioner simply cannot establish the second requirement under substantive due process, i.e., to prove prejudice, or a reasonable probability that the verdict might have been different had the trial been properly conducted. This is so for at least two reasons.

The first reason for Petitioner not being able to succeed in a substantive due process claim is that that Petitioner merely sought to have the testimony stricken, but did not seek a new trial. Striking the evidence, even if we assume, as we do, that jurors obey trial court instructions, would not cause the jurors to "un-remember" the testimony. That the remedy sought was merely striking the testimony, we cannot find that the failure to strike prejudiced Petitioner.

The second reason that Petitioner fails is that we agree with the Superior Court's analysis albeit in their harmless error analysis under state law, that the testimony of Nolder was "but a very tiny piece of the rather large body of evidence against Henry Lanz. We are confident the jury would have reached the same conclusion had Nolder never testified." ECF No. 17-6 at 24. Furthermore, the important part Nolder's testimony, i.e., the part where Nolder indicated that a Henry Lanz offered to pay her to harm his wife, did not prejudice Petitioner because it was simply cumulative of many other pieces of such evidence from other witnesses who also testified that Petitioner offered to pay someone to beat up or kill his wife, and that Petitioner had discussions with the witnesses regarding the use of pills, a gun, and cyanide, as explained by Respondents in their Answer. ECF No. 17 at 31.

Accordingly, for all of the foregoing reasons, Ground Two fails to merit federal habeas relief.

**C. Ground Three - Alleged Ineffectiveness for Failing to Argue the Number of Shots.**

Petitioner complains that his trial counsel was ineffective for failing to fully argue to the jury that Karl Laughlin gave inconsistent testimony regarding the number of gun shots, asserting that Laughlin testified as to two shots one time and three shots another time. At trial, Laughlin testified:

> [Direct;] [sic] Q. Now, you go... back to the actual shooting. You state that she was squatted down, correct?
>
> A. Yes.
>
> Q. Do you know how many times he shot her?
>
> A. Twice.
>
> ...
>
> [Cross-examination:]Q. At some point, you actually heard who you believed to be Paula scream, correct?
>
> A. Yes.
>
> Q. And then you heard a gunshot?
>
> A. I heard a popping sound, yes.
>
> Q. You then got off the couch, and you proceeded to go down the stairs, correct?
>
> A. Correct.
>
> Q. And at that point in time...she was holding her mouth or her jaw area?
>
> A. Yes.
>
> Q. And she was bleeding at that point?
>
> A. Yes.
>
> ...

Q. Now...[o]nce Paula stumbles and crouches down, propped up by the walls, you claim that you saw [petitioner] shoot her twice, two more times?

A. Two more times, yes.

Q. In the head?

A. Yes.

Q. Total of three gunshots?

A. Total of three times.

Q. She's shot three times. Is that what you said?

A. (Witness nods head).

ECF No. 17 at 33 – 34 (quoting T.T. 321, 378, 382).

The Superior Court addressed the lack of merit of this claim as follows:

The primary problem with Lanz's argument is that it misconstrues the record. He is correct that Laughlin first testified on direct examination that he watched Lanz shoot the victim twice in the head. *See* N.T., Trial, 8/27/08, at 321. Furthermore, he is correct in stating that Laughlin subsequently testified to a total of three shots. *See id.,* at 382. However, the critical distinction elided by Lanz is that Laughlin testified that he heard the first shot before he proceeded downstairs to observe the altercation between Lanz and the victim. *See id.,* at 378. Therefore, there is no actual contradiction between Laughlin's statements that he saw Lanz shoot the victim twice and that there were a total of three shots. We thus conclude that Lanz's first claim of trial counsel ineffectiveness lacks arguable merit, and affirm the PCRA court's decision to dismiss it without a hearing.

Com. v. Lanz, 1134 WDA 2015, 2016 WL 3268833, at *5 (Pa. Super. June 14, 2016).

Petitioner fails to argue that this disposition is contrary to or an unreasonable application of any United States Supreme Court precedent as is his burden. Nor has he shown an unreasonable determination of the facts. Accordingly, Ground Three does not merit federal habeas relief.

Even if Petitioner had shown an unreasonable determination of the facts, all that he would be entitled to would then be to have this Court review this Ground for relief *de novo*. Price v. Warren, 726 F. App'x 877, 884 n.48 (3d Cir. 2018) ("If we determine, considering only the evidence before the state court, that ... the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim *de novo*....") (quoting Hurles v. Ryan, 752 F.3d 768, 778 (9th Cir. 2014)). Conducting *de novo* review of this Ground for relief, we conclude that Petitioner cannot establish prejudice from his counsel's failure to argue this point to the jury given Laughlin's testimony as to his observations and the other substantial evidence of Petitioner's guilt, even if Laughlin misstated the number of shots.

### D. Ground Four – Alleged Ineffectiveness for not Presenting Evidence from Petitioner's Daughter that Laughlin Shot the Victim.

Petitioner next claims that his trial counsel was ineffective for failing to present "the Testimony and/or Evidence that [his daughter A.L.] witnessed Karl Laughlin Kill the Victim." ECF No. 5 at 8.[5]

The facts underlying this claim are as follows. A case worker from the Allegheny County Office of Children, Youth and Families, ("CYF") visited the foster home of Petitioner's daughter, on February 8, 2007, and made a note in the intake log. The note stated: "2.2.07 Home visit with the E.C. They did tell the CW the M is deceased. [A.L.] said that she saw 'Carl' kill M (shot)." ECF No. 17-9 at 18.

The Superior Court decided this issue on the merits as follows:

---

[5] A.L. is Petitioner's minor daughter. She was five years old at the time of her mother's murder. As such, her name has been redacted from this Opinion.

With respect to Lanz's argument that counsel should have called his daughter to testify, Lanz did not plead or certify that his daughter would have testified consistently with the statement contained in CYF's notes. This failure is fatal to Lanz's contention that he is entitled to a hearing on this claim. **See *Commonwealth v. Reid,*** 99 A.3d 427, 438 (Pa. 2014); 42 Pa.C.S.A. § 9545(d)(l).

Regarding Lanz's argument that trial counsel should have called the unnamed CYF caseworker to testify, Lanz's failure is even more basic: He has failed to even identify who this person is, let alone that he or she would have testified in conformity with the notes held by CYF. Thus, the PCRA court was correct in finding that Lanz had not established his right to a hearing on this argument.

Finally, Lanz makes a passing argument that trial counsel should have presented the CYF notes at trial pursuant to hearsay exceptions. The PCRA court addressed the substance of this claim as follows.

> Finally, given the facts of the case and the evidence presented, even if this statement could have somehow made it into evidence, it could not possibly have changed the outcome of the trial. It was not disputed that Karl was present in the home when the victim was shot. Nor was it disputed that the defendant's daughters were in the home though it is not clear that they were aware of what happened. Laughlin testified that he heard the shot when he was upstairs. It must be remembered that the girls were in their fathers' custody after the murder of their mother until his arrest several days later. What, if anything, he told the girls is unknown. Where they were when their mother was shot is also unknown. It would not be unreasonable for a five-year-old child to assume, after learning that her mother had been shot, that the person who shot her was the only other person in her home than her father, Karl Laughlin. In the absence of any corroboration of the statement, there is no way that this comment by a 5½-year-old-child could have possibly changed the outcome of the trial.

PCRA court opinion, 1/2/15, at 8. Thus, it is clear the PCRA court found that even assuming the admissibility of the CYF notes, Lanz did not establish the prejudice prong of his claim. We cannot conclude that this reasoning constitutes an abuse of the PCRA court's discretion, and therefore Lanz's second argument on appeal merits no relief.

ECF No. 17-12 at 42 – 43.

Petitioner does not argue, and we do not find, that the Superior Court's disposition is contrary to or an unreasonable application of United States Supreme Court precedent.

Petitioner has not shown that his daughter was available, competent to testify, willing to testify, or that she would have testified consistently with the intake log note by an unidentified CYF caseworker. Petitioner could only have established his trial counsel's ineffectiveness for not calling Petitioner's 5½ year old daughter if, as the state courts noted, she was available to testify. Part of this analysis of her availability would be the determination of whether she was indeed competent to testify. There is nothing in the record before this Court to establish that she was competent to testify. Since the record is silent in this regard, we may presume that she was not competent to testify. Therefore, Petitioner's trial counsel was not ineffective for failing to seek to put the child forward as a witness because counsel presumably determined, and accurately so, that the 5½ year old child was not competent to testify. This analysis is simply an application of the strong presumption of effectiveness that we are to indulge in, and indeed also a function of the doubly deferential review compelled by the AEDPA given that the state courts rejected this claim on the merits. See, e.g., Cullen v. Pinholster, 563 U.S. 170, 196 (2011) where the court explained that in fact, we must affirmatively entertain the range of possible reasons for Petitioner's counsel may have had for proceeding as he did. As the United States Supreme Court explained:

> Nor did the Court of Appeals properly apply the strong presumption of competence that *Strickland* mandates. The court dismissed the dissent's application of the presumption as "fabricat[ing] an excuse that the attorneys themselves could not conjure up." 590 F.3d, at 673. But *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The Court of Appeals was required not simply to "give [the] attorneys the benefit of the doubt," 590 F.3d, at 673, but to affirmatively entertain the range of possible "reasons Pinholster's

counsel may have had for proceeding as they did," *id.*, at 692 (Kozinski, C.J., dissenting). *See also Richter, supra*, at 110, 131 S.Ct., at 791 ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

Accord  Chandler v. United States, 218 F.3d 1305, 1316 n.16 (11th Cir. 2000); Isom v. Fisher, CIV.A. 14-237, 2014 WL 4640847, at *6 (W.D. Pa. Sept. 16, 2014) ("'[a]n ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of counsel's effectiveness]. Therefore, where the record is incomplete or unclear about [counsel]'s actions, [the court] will presume that he did what he should have done, and that he exercised reasonable professional judgment.' In the absence of record evidence about trial counsel's actions, this Court will presume that he did not call Skidmore to testify because his taking the witness stand would have opened up both his prior criminal history and Petitioner's, thereby far outweighing any possible benefit that could have been gained by having him testify on Petitioner's behalf.") (citations omitted).

In light of the foregoing analysis, Petitioner fails to carry his burden under AEDPA to show that there is no "reasonable argument that counsel satisfied *Strickland's* deferential standard." Premo v. Moore, 562 U.S. 115, 122 - 123 (2011).

Accordingly, Ground Four does not merit any federal habeas relief.

### E. Grounds Five to Nine Rely on Martinez but do not Merit Relief.

Petitioner concedes that the claims of ineffective assistance of trial counsel contained in Grounds Five through Nine were all procedurally defaulted. As such, he invokes Martinez to serve as cause to excuse the procedural default of these claims of trial counsel's alleged ineffectiveness. See ECF No. 5 at 10 ("ALL REMANING CLAIMS SET FORTH BELOW ARE BEING RAISED PURUSANT TO MARTINEZ V. RYAN, 132 S. Ct. 1309 (20-12)"). In Ground Five, Petitioner claims his trial counsel was ineffective for failing to cross examine Ms.

Nolder, especially on whether she knew, for example, whether Petitioner was known for driving a light blue Chrysler Voyager Minivan, which was apparently seen outside of Petitioner's residence on the night of the murder. ECF No. 5 at 10. In Ground Six, Petitioner claims his trial counsel was ineffective for failing to raise the Commonwealth's failure to disclose the evidence of Karl Laughlin's crimen falsi. Id. In Ground Seven, Petitioner complained that his trial counsel was ineffective for failing to object to the trial court's allegedly erroneous instruction to the jury as it related to Third Degree murder. Petitioner complains about the jury instruction that "third degree murder is a killing with malice that is not first degree for our purposes." Id. at 11. In Ground Eight, Petitioner contends that his trial counsel was ineffective for his failure to investigate and provide expert witness testimony regarding the blood evidence found on the victim. Id. In Ground Nine, Petitioner asserts that his trial counsel was ineffective for failing to investigate and provide the testimony of Detective Russ Thompson, Robin Redmond and Doug Soulier.

Under Martinez, Petitioner bears the burden of establishing the ineffectiveness of PCRA trial counsel in order to seek to excuse the procedural default of a claim of trial counsel's ineffectiveness. The standard for determining whether PCRA trial counsel was ineffective or not is the normal Strickland standard of deficient performance coupled with prejudice. Workman v. Superintendent Albion SCI, 915 F.3d 928, 2019 WL 545563, at *4-5 (3d Cir. Feb. 12, 2019); Preston v. Superintendent Graterford SCI, 902 F.3d 365, 376-77 (3d Cir. 2018). Under this standard, we note that there is no one correct way to represent a client and defense counsel must have latitude to make tactical decisions. Lewis v. Mazurkiewicz, 915 F.2d 106, 115 (3d Cir. 1990). See also Kauffman, 109 F.3d at 190 ("[i]t is [] only the rare claim of

ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.").

## 1. Petitioner fails to show PCRA counsel was ineffective.

Petitioner fails the first prong of establishing that his PCRA trial counsel, engaged in deficient performance. All of the normal rules of ineffectiveness apply under <u>Martinez</u>, when evaluating a claim of PCRA counsel's alleged ineffectiveness which is asserted as cause to excuse the procedural default of a claim of ineffectiveness by trial counsel, <u>i.e.</u>, PCRA counsel is presumed effective and it is Petitioner's burden to prove otherwise. <u>See</u>, <u>e.g.</u>, <u>Murray v. Diuguglielmo</u>, CV 09-4960, 2016 WL 3476255, at *5 (E.D. Pa. June 27, 2016). The Court in <u>Murray</u>, succinctly stated the applicable rules:

> In assessing the effectiveness of PCRA Counsel, the Court is "required to...assume" that PCRA Counsel "made an informed judgment call that was counsel's to make" "unless the petitioner has come forward with evidence to the contrary sufficiently probative to overcome the 'strong presumption' required by *Strickland*." *Sistrunk v. Vaughn*, 96 F.3d 666, 671 (3d Cir. 1996). "Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those most likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)); *see also Tok v. Glunt*, 2016 WL 721280, at *5 (E.D. Pa. 2016) ("PCRA counsel, acting as an appellate attorney, was entitled to select those issues on collateral review that he thought most likely to succeed on behalf of his client."). Thus, the Court must presume that PCRA Counsel withdrew this claim "for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).

Id.

In the instant Petition, Petitioner fails to even argue, yet alone, convince the Court that the issues which his PCRA trial counsel did raise in the counseled PCRA Petition, were any less strong than the issues that Petitioner contends his PCRA trial counsel should have raised but did not. In fact, it is Petitioner's failure to make such an argument that necessarily results in

Petitioner's failure to carry his burden to rebut the presumption of effective assistance of counsel and to show deficient performance on the part of his PCRA trial counsel in the initial PCRA petition proceedings. In this regard, we note that his PCRA counsel raised the alleged ineffectiveness of trial counsel for failing to introduce the evidence of Petitioner's daughter saying that she saw Karl kill her mom, and trial counsel's failure to cross examine Laughlin about the number of shots he heard fired, both issues we note that Petitioner himself feels were strong enough to be raised herein. On this record Petitioner fails to show deficient performance on the part of PCRA trial counsel.

In addition, Petitioner fails to argue yet alone establish how he was prejudiced by PCRA trial counsel's actions in choosing the issues he chose and forgoing the issues raised by Petitioner herein. Petitioner has failed to show that the claims of trial counsel's ineffectiveness raised in Grounds Five to Nine were substantial claims within the contemplation of Martinez. Bundy v. Garman, CV 17-3308, 2019 WL 1811007, at *15 (E.D. Pa. Feb. 26, 2019) ("The *Martinez* analysis requires the federal court to determine whether PCRA counsel was ineffective utilizing the familiar *Strickland* analysis, but evaluating prejudice by determining whether the underlying claim of ineffectiveness of trial counsel was 'substantial' utilizing the standard for granting a certificate of appealability."), *report and recommendation adopted*, 2019 WL 1787647 (E.D. Pa. Apr. 24, 2019).

Indeed, Petitioner fails to carry his burden to show that the claims of trial counsel's ineffectiveness raised in Grounds Five to Nine are "substantial" within the contemplation of Martinez. Petitioner fails for at least two independent reasons. The first reason that he fails to show a substantial question of trial counsel's ineffectiveness are the various reasons that

Respondents provide in their Answer.  ECF No. 17 at 39 – 54.  The second reason is Petitioner

fails to show a substantial question of prejudice as we discuss immediately below.

### 2. Petitioner cannot show a substantial question of prejudice from trial counsel's alleged deficient performance.

The second reason is that based on the evidence of record, which we have carefully

reviewed, Petitioner cannot show a substantial question of prejudice from any of trial counsel's

alleged deficient performances raised in Grounds Five through Nine.  We find that evidence of

record to be of such quality and strength that there is no reasonable probability of a different

outcome.

We rely on the following evidence.  First, we acknowledge, as we must, that the

testimony of the eyewitness to the murder, i.e., the testimony of Karl Laughlin, if believed, as the

jury most certainly did, constitutes overwhelming evidence of Petitioner's guilt.  While it is true

that Karl Laughlin was not a sympathetic figure and while Petitioner's trial counsel did attack the

credibility of Karl Laughlin, we find that the jury's crediting of Mr. Laughlin's testimony to be

unassailable given that  Karl Laughlin's version of what actually transpired during the shooting

was corroborated by the physical evidence obtained by the forensic experts.  Mr. Laughlin

testified as follows on direct examination, in relevant part about what he observed after he heard

a loud pop and a scream in the basement, when he then went down the basement steps and

stopped on the third or fourth step from the bottom of the stairwell:

Q.  Now, do you observe anything about Paula as she starts backing out?

A.  Well, yeah.  When she gets like right about at this angle right here, I notice
that she is holding her jaw, and that there's blood coming out of her hands.

Q.  What happens next, sir?

A. She walks – this is about a two-foot section right here. She stumbles back. She grabs the doorway right here and like falls into the room, like spins around like.

Q. I'll take you to Commonwealth Exhibit No. 34.

A. Like she was  - - she spun around this way, and he [i.e. Petitioner] starts advancing towards her, coming through the door right there.

Q. What does she do next?  Take you to Commonwealth Exhibit No. 35.

A. Paula's back up into this corner right here. She's crouched down. Henry is standing over top of her. I come through the door.

Q. Hold on.

A. I come through this door, and I'm - - body is in between the doorway right here. Henry is approximately right here. I see him raise his hand, and I see him shoot his wife.

T.T. at p. 315 line 3 to p. 316 line 2.

The important detail in Laughlin's description of the victim grabbing the doorway is confirmed by the forensic evidence gathered by the forensic scientists who processed the scene of the crime. The testimony of Commonwealth expert and criminal scene investigator, Mandy Tinkey, indicated that the criminal scene investigators had used Luminol, which is a chemical reagent that reacts when it comes into contact with what is presumptively human blood. T.T. 435 (there are no line numbers on these pages) to 436 (indicating that the strongest reaction of the Luminol occurred on a portion of the door frame). The forensic investigators then removed the portion of the door frame and brought it back to the laboratory for further analysis including DNA analysis. Id. at 437. Then the Commonwealth's forensic expert in DNA analysis, Robert Askew, took the stand and testified that he had tested the area on the door frame for DNA and that the DNA on the door frame was a match to the victim's DNA. T.T. p. 444 to 447.

In addition, the trajectory of the bullet that entered toward the top of the victim's head, as testified to by the Medical Examiner witness, seemingly confirmed that the shooter was standing above the victim, shooting downwards just as Laughlin had testified that Petitioner was standing and the victim was crouched down on the floor. T.T. at p. 200, lines 6 – 14.

In light of all of this physical evidence, which fully corroborates the testimony of Karl Laughlin, and in light of his testimony, which, if credited, as apparently it was, provides overwhelming evidence of Petitioner's guilt, we find that Petitioner cannot possibly sustain his burden of showing a substantial question of prejudice regarding any possible deficient performance on the part of Petitioner's trial counsel. Accordingly, Grounds Five through Nine cannot provide a basis for the grant of federal habeas relief.

## V. CERTIFICATE OF APPEALABILITY

A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2). The Court concludes that jurists of reason would not find it debatable whether the Petitioner made a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability will be denied.

## VI. CONCLUSION

**AND NOW,** this 2nd day of March 2020, it is hereby **ORDERED** that for the reasons set forth herein, the Petition is **DENIED**. Because we conclude that jurists of reason would not find the foregoing debatable, a certificate of appealability is likewise **DENIED**.

BY THE COURT,

MAUREEN P. KELLY
UNITED STATE MAGISTRATE JUDGE

cc:    All counsel of record via CM-ECF

HENRY LANZ
HV-7124
SCI Graterford
PO Box 244
Graterford, PA 19426-0244

HENRY LANZ
HV-7124
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426